**FIRST DIVISION**
**ELLINGTON, C. J.,**
**PHIPPS, P. J., and DILLARD, J.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
(Court of Appeals Rule 4 (b) and Rule 37 (b), February 21, 2008)
http://www.gaappeals.us/rules/

**March 29, 2013**

# In the Court of Appeals of Georgia

A12A1950. CANCEL v. SEWELL et al.

A12A1951. SEWELL et al. v. CANCEL.

A12A1952. FAULK et al. v. CANCEL.

PHIPPS, Presiding Judge.

After the anesthesiology department of a hospital underwent a restructuring, four anesthesiologists who had been working there under their practice group were not selected for continued employment. Alleging that they had been wrongfully terminated because they had voiced concerns of fraudulent billing practices by fellow anesthesiologists, the four anesthesiologists – Angel Cancel, M.D., Pravin Jain, M.D., Grace Duque-Dizon, M. D., and Monajna Sanjeev, M.D. – filed suit against numerous individuals and entities. Herein, we review several rulings on various defendants' motions for summary judgment. For reasons explained below, we affirm the judgment

in Case No. A12A1950; we reverse in part the judgment in Case No. A12A1951, while dismissing that case in part; and we dismiss Case No. A12A1952.

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[1] "In our de novo review of the grant [or denial] of a motion for summary judgment, we must view the evidence, and all reasonable inferences drawn therefrom, in the light most favorable to the nonmovant."[2]

Viewed thus in favor of the plaintiffs, the evidence showed the following. The four anesthesiologists formerly practiced medicine under their group called Central Georgia Anesthesia Services, P. C. (hereinafter "CGAS"). It was comprised of approximately 14 anesthesiologists who were all shareholders, members of the board of directors, and employees of that company. During the years leading up to the restructuring in 2003, CGAS was under an exclusive contract with The Medical

---

[1] OCGA § 9-11-56 (c).

[2] *Cowart v. Widener*, 287 Ga. 622, 624 (1) (a) (697 SE2d 779) (2010) (citation and punctuation omitted); see *Norton v. Budget Rent A Car System*, 307 Ga. App. 501 (705 SE2d 305) (2010) ("We review the denial of summary judgment de novo, viewing the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.") (footnote omitted).

Center of Central Georgia, Inc. (hereinafter "The Medical Center"), whereby only CGAS would provide anesthesiology services, through its physician-employees, to The Medical Center's Macon hospital and that hospital's patients.

*Pertinent Terms of the Contract between CGAS and The Medical Center*

The contract relevant here provided that its "Term" would run from March 1, 2000 to February 28, 2002, unless terminated earlier pursuant to that contract. Upon its expiration or termination, the contract required CGAS physicians to resign their hospital privileges; if any such physician failed to do so, the contract provided that The Medical Center could terminate that physician's privileges. The contract did not terminate in February 2002, as the parties agreed to extend it through mid-January 2004.)

*Allegations of Billing Fraud Committed by Certain CGAS Physicians*

In April 2001, CGAS physician Cancel (who would become a plaintiff in the instant action) was named CEO of CGAS. Thereafter, he discovered what he believed showed that certain of his CGAS physician colleagues were fraudulently billing Medicare/Medicaid as well as insurance companies, thereby yielding unearned revenues for both CGAS and The Medical Center. He discussed the billing irregularities with CGAS members. And later, Cancel met with the Vice President for

3

Medical Affairs for The Medical Center, Louis Goolsby, M.D., and notified him of the perceived billing problems. Cancel deposed that, within a short period of time, tension, stress and interpersonal problems arose amongst certain of the CGAS physicians.

Dissatisfied because of what he saw as continued noncompliant billing practices, Cancel, with The Medical Center's approval, contacted the American Society of Anesthesiologists (hereinafter "ASA") and requested an independent third-party investigation. But about a week before the scheduled investigation, during the first week of December 2002, Goolsby canceled the ASA's visit and investigation. Cancel, who already was contemplating quitting his practice at the hospital and moving to another state, was not informed of the cancellation beforehand. As he recalled during his deposition, "[B]y then I am frustrated and when [Goolsby] cancels that without telling me, without consulting with anybody, just unilaterally cancels, I gave up and I said, that's it. . . . Emotionally I had probably decided I can no longer stay here unless this is fixed."

*Investigation Conducted by a Third-Party*

Meanwhile, the Chief Executive Officer of The Medical Center, A. Donald Faulk, engaged a psychological consultant to evaluate the interpersonal dynamics

4

amongst the CGAS physicians. Alvin Sewell, M. D., a shareholder/director/employee himself of CGAS, encouraged his fellow CGAS physicians to interact with that consultant. And thereafter, they did so. Cancel revealed during his discussion with the consultant in January 2003 his concerns of ongoing fraudulent billing irregularities.

In January 2003, Cancel submitted his resignation to be effective March 1, 2003, but within days of so submitting, changed his resignation to a one-year vacation leave. In February 2003, Cancel began a series of trips to Colorado, during which he researched housing, hospitals, and medical licensing. In March, he began a medical practice in Colorado, where he continued to practice until at least his deposition in the instant case. Hence, after Cancel took vacation leave in February 2003, he never again practiced medicine as a CGAS employee at the Macon hospital. Cancel admitted in his deposition that he had essentially abandoned his post as CEO of CGAS, adding that he had concluded that "the post had no power any more and no decision-making, I was a captain without a ship." In June 2003, Cancel resigned from his employment with CGAS.

While Cancel was on leave, Jain (who would become another plaintiff in the instant case) had acted as CGAS's CEO. Having also become concerned about potential billing non-compliance, Jain reviewed anesthesia records for a period of

5

time through about the middle of April 2003 and discovered therein indications of billing irregularities by certain CGAS physicians. Jain shared with Goolsby his findings, as well as his belief that his findings showed that elements of billing compliance were missing.

*Action by The Medical Center*

A few days later, Faulk (as President/CEO of The Medical Center) sent a letter dated April 25, 2003 to Cancel (as CEO of CGAS), advising that, due to the allegations raised about and by certain CGAS representatives, including behavioral issues and fraudulent billing practices, The Medical Center was intending to cancel its contract with CGAS, effective May 31, 2003, pursuant to the contract's "with cause" clause, unless CGAS demonstrated by that date that it was in substantial compliance with the contract. The April 25 letter demanded that CGAS promptly retain a qualified independent consulting firm, subject to The Medical Center's approval of both the firm and its audit protocol, to conduct an audit of CGAS's billing practices and report the findings thereof to CGAS and to The Medical Center.

Additionally, the April 25 letter announced The Medical Center's intent to restructure its anesthesiology department effective February 29, 2004, even if CGAS demonstrated its compliance with their contract on or before May 31, 2003. And the

6

letter informed CGAS that, beginning May 12, 2003, The Medical Center would begin a "recruitment process for staff anesthesiology positions" and those hired would become its "employees or independent contractors." The letter outlined that any CGAS physician intending to provide services in the restructured anesthesiology department should promptly submit an application and that, although The Medical Center could not guarantee that any member of CGAS would be offered a contract of employment within the restructured department, The Medical Center would evaluate each application "fairly, objectively and on its individual merits."

*Actions Taken by CGAS and Certain CGAS Physicians*

Days later, at a CGAS shareholders and directors meeting on April 29, 2003, the attendees discussed a corporate dissolution. Sewell represented that a dissolution would serve to remove any encumbrances that might stand in the way of the hospital's restructuring and allow the hospital to negotiate contracts with the individuals of the group. At a May 5, 2003 CGAS shareholders and directors meeting, a proposal was unanimously passed that the CGAS contract with The Medical Center would terminate on August 31, 2003.

Meanwhile, Cancel, Jain, Duque-Dizon, and Sanjeev (who would become the four plaintiffs), along with other CGAS physicians, submitted their respective

applications to work in the restructured department. Of those specific four, three were interviewed; Cancel, who by then was living in Colorado, was invited to be interviewed, but declined. None of those four doctors received an offer to join the restructured department, but eight other CGAS physicians did receive offers. Consequently, with the August 31, 2003 termination of CGAS's contract with The Medical Center, the three doctors (excepting Cancel, who already had resigned) lost their jobs as CGAS employees practicing at The Medical Center's hospital.

*Changes Implemented at the Department of Anesthesiology*

A few months later, in November 2003, Nexus Medical Group, LLC was formed. It is undisputed that, as of January 1, 2004, that company was under contract with The Medical Center as its exclusive provider of anesthesia services. Nexus was comprised of some former CGAS physicians – including Sewell, as well as physicians who had never been members of CGAS. Several of those physicians who had not been part of CGAS were recruited to Nexus as a result of Sewell's efforts. One such anesthesiologist, Nexus's Rule 30 (b) (6)[3] witness in the instant action, deposed that in 2003, "[Sewell] just came to me purporting to represent the group that was hiring some anesthesiologists. He had already hired two of my partners before me." That

---

[3] See OCGA § 9-11-30 (b) (6) (concerning deposition of an organization).

anesthesiologist deposed further that, at Nexus, Sewell's title was "board chair;" serving in that role from 2004 to 2009, then re-elected in 2009 to serve another five-year term, Sewell was a "point of continuity" and "represent[ed] the [Nexus] group primarily to the hospital. . . . He would be the primary face there."

*Litigation in the Trial Court*

Cancel, Jain, Duque-Dizon, and Sanjeev initiated the instant lawsuit for damages. They claimed that they had been "singled out" for exclusion and expulsion from providing services to The Medical Center because they had voiced concerns about fraudulent billing procedures. The defendants they named, as have since been grouped by the litigating parties, were: (a) Sewell, Miles H. McDonald, M. D.,[4] and Sanjiwan Tarabadkar, M. D. – who all were CGAS physicians, but more significantly here, who all were CGAS physicians who subsequently became Nexus physicians working at The Medical Center's hospital; (b) The Medical Center and two of its officers, Goolsby and Faulk; and (c) Nexus, the corporate entity that obtained an exclusive contract to provide anesthesiology services at The Medical Center after its contract with CGAS's terminated.

---

[4] Although Valray Jean McDonald, as Executrix of the Estate of McDonald, has since been substituted for this defendant, we refer to that party herein as "McDonald."

9

The plaintiffs sought recovery under a number of causes of action. Among their theories, they alleged: (1) Sewell, Tarabadkar, and McDonald, as directors and officers of CGAS, had breached fiduciary duties owed to them by engaging in fraud and misrepresentations; (2) The Medical Center and two of its officers, Goolsby and Faulk, had caused, induced, or conspired in the breach of fiduciary duties by Sewell, Tarabadkar, and McDonald; and (3) all defendants had committed fraud and deceit. The plaintiffs also sought relief under the False Claims Act;[5] plaintiffs alleged that they (the plaintiffs) had engaged in conduct protected thereunder, yet The Medical Center, its agents and officials had retaliated against them by terminating their ability to provide anesthesiology services at the hospital. Additionally, the plaintiffs asserted that "the Defendants have breached and violated Plaintiff's freedom of speech rights under the Georgia Constitution,"[6] by "retaliating against them for speaking out and opposing Medicaid/Medicare fraud, which is a matter of public concern." Regarding Nexus, the plaintiffs set out in their complaint:

> In order to effectuate their scheme to exclude the [p]laintiffs from continuing to provide anesthesia medical services to [The Medical

---

[5] 31 USC § 3729 et seq; see 31 USC 3730 (h) (concerning relief from retaliatory actions).

[6] (Citing Ga. Const., Art. I, Sec. I., Para. v.).

Center] and to silence the [p]laintiffs criticisms, and to exclude [p]laintiffs from having access to billing records, the [d]efendants utilized the subterfuge of terminating the anesthesia contract with CGAS and created a new company (The Nexus Medical Group, LLC) which excluded the [p]laintiffs. Defendants Tarabadkar, Sewell and McDonald became principals and members of Nexus who in turn became a participant in the wrongdoing as a co-conspirator. In actuality, [Nexus] is the alter ego of [The Medical Center], Goolsby and Faulk and Defendants Sewell, Tarabadkar and McDonald individually, and was established and designed to further the fraudulent conspiratorial actions of Defendants in depriving the [p]laintiffs of their contractual rights and eliminating the [p]laintiffs from being able to provide anesthesia services to [The Medical Center]. [Nexus] through the actions of Tarabadkar, Sewell and McDonald became a co-conspirator to their actions and is equally liable for them.

A barrage of summary judgment motions filed by the defendants challenged the plaintiffs' claims on various grounds. Numerous hearings were conducted. At one such hearing, defendants attacked particularly Cancel's claims, positing that circumstances leading to his employment termination differed from those of the other plaintiffs in this critical aspect: Cancel chose not to be interviewed and instead resigned.

11

Subsequently, a series of orders entered by the trial court amounted to the grant of summary judgment against Cancel as to *all* his claims – the last of such orders recited: "[H]aving heard oral argument on November 10, 2011, as well as on several other occasions, IT IS HEREBY ORDERED that Defendants' motions for summary judgment as to plaintiff Cancel are GRANTED, and Dr. Cancel is hereby dismissed from this case." That order was entered on November 10, 2011.

Within 30 days of said entry, on December 8, Cancel filed a notice of appeal, citing the November 10 order as the directly appealable order and further stating that he would be challenging additional rulings in the case, including an "October 28, 2011 order granting summary judgment on Plaintiff Cancel's 'free speech' retaliation claim pursued under the Georgia Constitution." Therefore, Cancel asserted, "The Georgia Supreme Court has jurisdiction over this appeal because it involves the construction of a provision of the Georgia Constitution"; hence, Cancel's notice of appeal was to the Supreme Court of Georgia. And within 15 days of the filing of Cancel's notice of appeal, two notices of cross-appeals were filed, thus, also to the Supreme Court of Georgia.

Upon the docketing of the three cases in the Supreme Court, however, that Court entered an order stating:

These appeals do not invoke the Court's jurisdiction over cases "in which the constitutionality of a law, ordinance, or constitutional provision has been drawn into question" (1983 Ga. Const., Art. 6, Sec. 6, Par. 2), since resolution of the issue (whether the defendants are state actors such that the constitutional provision applies to them) involves only the application of an unquestioned and unambiguous provision of the Constitution. [Cit.] Since appellate jurisdiction over the cross-appeals is dependent upon the alleged constitutional question and there does not appear to be any other basis for jurisdiction in this Court, all the appeals hereby are transferred to the Court of Appeals.

Accordingly, the three cases were docketed in this court. We consider each of the three appeals in turn.

*Case No. A12A1950*

The notice of appeal that gave rise to Case No. A12A1950 was filed solely by Cancel.

1. Cancel contends that the trial court erred by granting summary judgment against him on his claim brought pursuant to the False Claims Act. But at the summary judgment hearing thereon, counsel for the plaintiffs (and, hence, for Cancel) announced to the trial court that he agreed that the motion for summary judgment should be granted as to that cause of action. Thereafter, the trial court entered an order granting summary judgment to all defendants as to this cause of action, citing,

13

inter alia, the summary judgment hearing. Given that this cause of action was thereby expressly abandoned, this contention has no merit.[7]

2. Cancel contends that the trial court erred by granting summary judgment against him on his free speech claim, which was premised on Ga. Const. Art. I, Sec. I, Para. V.[8] He cites language in *Goolsby v. Regents of the Univ. System of Ga.*:[9] "For a *state* to withhold an expected promotion or pay raise as a sanction for the exercise

---

[7] See *Heidler v. State*, 273 Ga. 54, 61 (9) (537 SE2d 44) (2000) ("A party cannot request a ruling from the trial court and then, on appeal, take the contrary position and complain that the ruling was error."); *Vincent v. State*, 276 Ga. App. 415, 417 (3) (623 SE2d 255) (2005) (concluding that where counsel expressly abandoned issue at the hearing, the issue was not preserved for appellate review); *Cooper Tire & Rubber Co. v. Merritt*, 271 Ga. App. 16, 22 (1) (b) (608 SE2d 714) (2004) (where party expressly abandoned during trial a cause of action, that claim could not be "resurrected on appeal"). See generally *Pfeiffer v. Ga. Dept. of Transp.*, 275 Ga. 827, 829 (2) (573 SE2d 389) (2002) ("Each party has a duty to present his best case on a motion for summary judgment. . . . [I]n responding to a motion for summary judgment, plaintiffs have a statutory duty to produce whatever viable theory of recovery they might have or run the risk of an adjudication on the merits of their case.") (punctuation and footnotes omitted); *Blakely & Son, Ltd. v. Humphreys*, 148 Ga. App. 281, 283 (1) (250 SE2d 826) (1978) ("[O]ne cannot complain of a judgment that by his own agreement he has aided in causing.")

[8] ("No law shall be passed to curtail or restrain the freedom of speech or of the press. Every person may speak, write, and publish sentiments on all subjects but shall be responsible for the abuse of that liberty.")

[9] 141 Ga. App. 605 (234 SE2d 165) (1997), overruled on other grounds, *Donaldson v. Dept. of Transp.*, 262 Ga. 49, 53 (3) (414 SE2d 638) (1992).

of the right to free speech is a restriction of that right in violation of the First and Fourteenth Amendments to the U. S. Constitution."[10]

Summary judgment was entered on this claim because the trial court found no evidence of a state action. Cancel does not dispute that state action is an essential element of the free speech claim; he argues that he presented evidence thereof.

(a) Cancel asserts that the requisite state action was shown "by virtue of the [1995] Hospital's lease with the Macon-Bibb County Hospital Authority 'to promote the public health needs of the community.'" But Cancel has failed to support his assertion with a record citation for the purported lease. "Because [Cancel] is the appellant, it is axiomatic that [he] bears the burden of showing error affirmatively by the record."[11] And an appellate court has no duty to cull the record on behalf of a party,[12] which record in this case comprises well over 16,000 pages. Furthermore,

---

[10] Id. at 610 (6) (emphasis supplied).

[11] *Luong v. Tran*, 280 Ga. App. 15, 18 (2) (633 SE2d 797) (2006) (punctuation and footnote omitted).

[12] *Westmoreland v. State*, 287 Ga. 688, 696 (10) (699 SE2d 13) (2010) (noting that appellant's failure to provide record citations for purportedly pertinent evidence left appellate court without any information as to the content of such evidence), citing *Luong*, supra at 16 (1) (reiterating that factual assertions must be supported with citation to the record and that "it is not [appellate court's] job to cull the record on behalf of a party").

Cancel has cited no authority to support his assertion that the requisite state action was shown "by virtue of" a 1995 lease between the Macon-Bibb County Hospital Authority and The Medical Center, the latter of which the evidence showed was a private, non-profit corporate entity.[13] This assertion demonstrates no basis for reversal.

(b) Cancel points out that one of the defendants, Sewell, was serving on the Macon-Bibb County Hospital Authority and asserts that certain conduct by Sewell thus supplied the requisite state action.[14] In particular, Cancel cites evidence: that Sewell was present at the initial meeting between Goolsby and the consultant; that Sewell admittedly told the CGAS physicians, who had not wanted to interact with that consultant, that it was mandatory that they do so; that in April 2003, Sewell said

---

[13] See generally *St. Mary's Hosp. of Athens v. Radiology Professional Corp.*, 205 Ga. App. 121, 125-126 (3) (a) (421 SE2d 731) (1992) ("State regulation of the hospital industry, even if extensive and detailed, does not give rise to the requisite connection. Nor is the fact that the administration of hospitals may be characterized as a business affected with a public interest sufficient to create the necessary nexus.").

[14] See generally *Spencer v. McCarley Moving & Storage Co.*, 174 Ga. App. 525, 528 (1) (330 SE2d 753) (1985) (explaining that determining whether a private citizen's conduct may be attributable to the state invokes the inquiry: "whether there is a sufficiently close nexus between the state and the challenged action of the private entity so that the action of the latter may be fairly treated as that of the state itself") (citation omitted).

16

at a CGAS shareholders and directors meeting that the purpose of the corporate dissolution was to remove any encumbrances that might stand in the way of the hospital's restructuring of the group and to allow the hospital to negotiate contracts with the individuals of the group; and that subsequent to the termination of the CGAS contract (effective August 31, 2003), Sewell took steps to hire physicians who would work for a newly-formed company, which became Nexus.

Notwithstanding, there is no evidence that these actions were taken by Sewell in his capacity as a member of the hospital authority. The evidence showed that Sewell was acting as a shareholder and director of CGAS (a private entity). The evidence showed further that Sewell was acting as a liaison between CGAS and The Medical Center (also a private entity). According to Sewell, "[t]he hospital had come to a point at which they were so disgusted with our dysfunctional behavior, that they did not want to deal with us at all. I believe that they were contemplating getting rid of all of us. They were sick of us fighting and using them as a third-party mediator." Acknowledging that he was not a duly elected officer of CGAS at the time, Sewell deposed further that Goolsby and other such hospital personnel "had indicated to [him] in no uncertain terms that they did not want to deal with the CGAS officers"

17

and had "asked [him] to be the contact person for the group. They did not want to talk directly to Dr. Jain or Dr. Cancel."

The mere fact that Sewell was a member of the hospital authority did not demonstrate a sufficient "nexus between the *state* and the challenged action"[15] (*which action Cancel does not specify herewith, but it is presumably the termination of his hospital privileges, despite his resignation*) so as to supply the state action as a foundation for the free speech claim.[16] Nothing in the cases cited by Cancel, *Faucher v. Rodziewicz*[17] and *Malak v. Assoc. Physicians*,[18] cases which involved public

---

[15] See id.

[16] See generally *St. Mary's Hosp. of Athens*, supra at 126 (1) (a) (concluding that, where no state entity or official participated in the challenged action of termination of doctor's staff privileges at the private hospital, and where the state regulations at issue did not compel plaintiff's termination of staff privileges, the private hospital was entitled to summary judgment on that claim for lack of state action).

[17] 891 F2d 864, 868 (II) (A) (11th Cir. 1990) (noting that, when those in charge of the affairs of a public hospital deal with staff, the dealings must conform to requirements and prohibitions of 14th Amendment, and thus when authorities of a public hospital, acting under color of law, deprive a person of a federally protected right, he may seek redress under Code Section 1983).

[18] 784 F2d 277, 282 (III) (7th Cir. 1986) (finding that the conduct of a public hospital and its employees was clearly state action and the conduct of otherwise private entities that acted jointly with *them* was also state action).

hospitals, provide for an outcome in Cancel's favor. Cancel has shown no error in the grant of summary judgment on his free speech claim.

3. Cancel contends that the trial court erred by granting summary judgment on his remaining claims, thereby dismissing him from the entirety of the case. He asserts, "The defendants failed to adequately pierce the allegations raised in the Complaint which show that Cancel was constructively discharged." Cancel does not offer any substantive argument to explain how his assertion, even if correct, resurrects any of his causes of action. And "[w]e will not speculate or make arguments on [Cancel's] behalf; to do so would improperly change this court's role from disinterested decision-maker to appellate advocate."[19]

(a) Instead, Cancel asserts that the defendants failed to pierce allegations he raised in his complaint. As reiterated recently in *Cowart v. Widener*,[20] however, a defendant moving for summary judgment

> need not affirmatively disprove the nonmoving party's case, but may point out by reference to the evidence in the record that there is an absence of evidence to support any essential element of the nonmoving

---

[19] *Harmon v. Innomed Technologies*, 309 Ga. App. 265, 270 (1) (b) (709 SE2d 888) (2011) (punctuation and footnote omitted).

[20] Supra.

19

party's case. Where a defendant moving for summary judgment discharges this burden, the nonmoving party cannot rest on its pleadings, but rather must point to specific evidence giving rise to a triable issue.[21]

(b) Cancel next asserts that he presented evidence that authorized a finding that he was "forced to quit his job due to the hospital defendants' refusal to address the concerns raised by him related to potentially fraudulent billing practices of the CGAS physicians for work performed in the Department of Anesthesiology at the hospital." But as Cancel acknowledges, after he took leave, the anesthesiology department underwent changes, and he was invited to interview for a position within the restructured department. He declined to be interviewed.

Cancel was asked during his deposition why he had declined, and answered, "I had gotten word that [a certain doctor (who is not a party to this litigation)] was on the board of the – committee board, so he is one of the anesthesiologists vying for the same position as I am in there." But Cancel conceded that the hospital would have needed more than one anesthesiologist for that particular position. In Cancel's opinion, however, the other doctor did not have "the most merit," which Cancel could not reconcile with his understanding of language in the April 25 letter which

---

[21] Id. at 623 (1) (citations and punctuation omitted).

indicated that physicians would be selected based on merit. Additionally, Cancel gleaned it inappropriate for that doctor to interview him, given Cancel's belief at the time that both of them were seeking "a position at the same place in the same stature."

On appeal, Cancel maintains that it was reasonable for him to so decline to be interviewed because, as was the case in *Kodish v. Oakbrook Terrace Fire Protection Dist.*,[22] "the handwriting was on the wall." While Cancel may have speculated that interviewing for a new position would have been fruitless, "[s]ummary judgment cannot be avoided based on speculation."[23] And although Cancel may also have felt pressured by the parties later named as defendants to effectively resign by choosing not to interview, the cases upon which he relies are inapposite.[24] Cancel has

---

[22] 604 F3d 490, 502 (II) (B) (7th Cir. 2010) ("In other words, constructive discharge also occurs where, based on an employer's actions, the handwriting was on the wall and the axe was about to fall.")

[23] *Cowart*, supra at 633 (3) (c) (citation omitted); see *Shadburn v. Whitlow*, 243 Ga. App. 555, 556 (533 SE2d 765) (2000) (an inference cannot be based upon evidence which is too uncertain or speculative or which raises merely a conjecture or possibility).

[24] Cancel cites *Kodish*, supra at 508-509 (II) (B) (concluding in a *Free Speech* case that constructive discharge was demonstrated, based on evidence of remarks made by the employee's supervisor during a personnel meeting where supervisor advocated for employee's termination and communicated that he did not like employee's pro-union stance, where supervisor expressed in deposition anti-union animus, and where supervisor commented to a third-party employee who later spoke

demonstrated no basis to overturn the grant of summary judgment as to any of the causes of action that he pursued.[25]

4. Cancel contends that the trial court erred by denying his motion to compel financial information from Sewell, Tarabadkar, and McDonald relating to their earnings, compensation, and benefits for the years *after* they had left the employ of

with plaintiff/employee; such evidence showed that "had [employee] not resigned he would have been terminated immediately"), and *Neal v. Honeywell, Inc.*, 191 F3d 827, 829-831 (7th Cir. 1999) (concluding in a *False Claims Act* case that a jury could find that the applicable test – whether a reasonable employee would have found her working conditions so inappropriate to her skill level that they made remaining in the job unbearable – was met, where whistle-blowing employee's immediate supervisor harangued employee for reporting the company's fraud then took away most of her responsibility until less than a quarter of her duties remained, and where a company manager who had been transferred out of state after the fraud revelations began a campaign of intimidation against whoever had alerted his superiors, made plenty of threats, and related to all who would listen his plans to "get" the snitch, describing the whistleblower as "dead meat," and announcing his intention to "break his legs," and where company did nothing in response to manager's public threats).

[25] See generally *Johnson v. Gen. Motors Corp.*, 144 Ga. App. 305, 306 (1) (241 SE2d 30) (1977) (granting summary judgment to employer in action for wrongful discharge where plaintiffs admitted that they had resigned; "[e]ven if it were shown that they resigned under pressure at their employer's request, that did not amount to discharge"); *Wilkinson v. Trust Co. of Ga. Assoc.*, 128 Ga. App. 473, 474 (2) (197 SE2d 146) (1973) (holding that, where employee was asked by employer to take a two months' leave of absence with pay in order to "think about his employment situation" and at the end of that period, employee submitted his resignation, "[e]ven if it is shown that the [employee] resigned under pressure at his employer's request, this did not amount to a 'discharge'").

22

CGAS and were employed by Nexus. . Given our holdings in Divisions 1 through 3,[26] as to Cancel (the only plaintiff to file a notice of appeal and hence the sole appellant in Case No. A12A1950[27]), this issue is moot and we therefore do not reach it.[28]

5. Cancel challenges the trial court's refusal to exclude at trial certain of the consultant's notes taken during her discussions with the CGAS physicians. Given the foregoing,[29] as to Cancel (the only plaintiff to file a notice of appeal and hence the

---

[26] Supra.

[27] While the remaining three plaintiffs could have sought review of rulings adversely affecting them, they elected not to file any notice of cross-appeal. See generally *Centennial Ins. Co. v. Sandner*, 259 Ga. 317-318 (1) (380 SE2d 704) (1989) (holding that an appellee may institute a cross-appeal against a party other than an appellant); *Executive Jet Sales v. Jet America*, 242 Ga. 307 (248 SE2d 676) (1978) (holding that where trial court granted one co-defendant's motion to dismiss, but denied the other co-defendant's motion to dismiss, and where plaintiff thereafter appealed the dismissal against the prevailing co-defendant, the other co-defendant was entitled to cross-appeal from the denial of its motion to dismiss).

[28] See OCGA §§ 5-6-34 (d) (providing that appellate court is not required "to pass upon questions which are rendered moot); 5-6-48 (b) (3) (providing that consideration of any enumerated error may be refused where the question presented has become moot).

[29] Divisions 1 through 3, supra.

sole appellant in Case No. A12A1950), this issue is moot and we therefore do not reach it.[30]

6. Cancel's final contention likewise is moot. He complains that the trial court denied the plaintiffs' motion to compel documents from The Medical Center. Cancel does not specify which discovery request was denied, but describes generally in his appellate brief that "[p]laintiffs sought to discover information related to the facts and/or information considered by the interview committee during the selection process utilized to rehire physicians after the termination of [The Medical Center]/CGAS contract." Cancel argues that, contrary to the position taken by The Medical Center, neither the peer review privilege[31] nor the medical review privilege[32] provided any basis for withholding the requested documents.

---

[30] See OCGA §§ 5-6-34 (d) (providing that appellate court is not required "to pass upon questions which are rendered moot); 5-6-48 (b) (3) (providing that consideration of any enumerated error may be refused where the question presented has become moot).

[31] See OCGA § 31-7-133 (concerning confidentiality of review organization's records).

[32] See OCGA § 31-7-143 (concerning committee proceedings and records immune from discovery or use as evidence in civil actions).

24

In light of the foregoing,[33] however, as to Cancel (the only plaintiff to file a notice of appeal and hence the sole appellant in Case No. A12A1950), this contention is moot and we therefore do not reach it.[34]

*Case No. A12A1951*

The notice of cross-appeal that gave rise to Case No. A12A1951 was jointly filed by the individual defendants Sewell, Tarabadkar, and McDonald, as well as the corporate entity Nexus.[35] In their joint brief,[36] the parties enumerate as error the denial of their respective motions for summary judgment.

7. Sewell, Tarabadkar, and McDonald contend that the trial court erred by denying their motion for summary judgment, but we have no jurisdiction over the challenged ruling.

---

[33] See Divisions 1-3, supra.

[34] See OCGA §§ 5-6-34 (d) (providing that appellate court is not required "to pass upon questions which are rendered moot); 5-6-48 (b) (3) (providing that consideration of any enumerated error may be refused where the question presented has become moot).

[35] See OCGA § 5-6-44 (a) (providing for joint appeals).

[36] See OCGA § 5-6-44 (b) (allowing, but not requiring, parties in joint appeals to file separate enumerations of error); Court of Appeals Rule 22 (a) (providing that "the enumeration of errors . . . shall be [p]art . . . of the appellant's brief" and that "[a] separate enumeration of errors is not required").

25

The case is not final, and the denial of Sewell's, Tarabadkar's, and McDonald's motion for summary judgment is not directly appealable.[37] These defendants had the right to file a joint cross-appeal from the November 10, 2011 order granting summary judgment against Cancel, once Cancel filed on December 8, 2011 a timely notice of appeal from that *directly appealable* judgment.[38] But the order they seek to challenge – the denial of their motion for summary judgment – was not entered until December 13, 2011. "Clearly, the [December 13, 2011] order was not prior to or contemporaneous with that *directly appealable* judgment. Judgments cannot be considered on appeal if rendered subsequent to the judgment appealed from"[39] – here, the grant of summary judgment against Cancel. Indeed, to hold otherwise would permit a cross-appellant (the party often with NO right to directly appeal) to challenge rulings entered during the 15 days *after* the filing of the appellant's notice of appeal, whereas it is axiomatic that the appellant (the party *with* the right to a direct appeal)

---

[37] OCGA § 9-11-56 (h) (pertinently providing, "An order denying summary judgment shall be subject to review by direct appeal in accordance with subsection (b) of Code Section 5-6-34.")

[38] OCGA § 9-11-56 (h) (pertinently provided that "[a]n order granting summary judgment on any issue or as to any party shall be subject to review by appeal").

[39] *Patel v. State*, 289 Ga. 479, 487 (5) n. 14 (713 SE2d 381) (2011) (citations and punctuation omitted).

may not – despite the broad language of OCGA § 5-6-34 (d).[40] We glean no legislative intent for granting favor in that manner to cross-appellants over appellants.

8. Nexus contends that the trial court erred in denying its motion for summary judgment, which order was entered on November 21, 2011. Nexus asserts that it (Nexus) was not in existence until months *after* the plaintiffs' employment through CGAS terminated, when it (Nexus) was organized as a legally separate entity from CGAS.

Under the plaintiffs' theory, the eventual formation of Nexus was a vital component of the other defendants' alleged scheme to defraud the plaintiffs out of their contractual rights. And cross-appellants have aptly cited cases for the proposition that, under a successor-in-interest principal, the date of a corporate

---

[40] OCGA § 5-6-34 (d) provides: "Where an appeal is taken under any provision of subsection (a), (b), or (c) of this Code section, *all* judgments, rulings, or orders rendered in the case which are raised on appeal and which may affect the proceedings below *shall be reviewed and determined by the appellate court, without regard to the appealability of the judgment, ruling, or order standing alone and without regard to whether the judgment, ruling, or order appealed from was final or was appealable by some other express provision of law contained in this Code section, or elsewhere.*" (emphasis supplied). See, however, *Southeast Ceramics v. Klem*, 246 Ga. 294, 295 (1) (271 SE2d 199) (1980) (in direct appeal from final judgment a party may enumerate as error prior or contemporaneous rulings); *Cates v. Cates*, 225 Ga. 612 (2) (170 SE2d 416) (1969) (appellant's challenge to ruling could not be considered on review where order had been entered after filing of notice of appeal).

formation may not end, as a matter of law, all inquiry as to the corporation's liability.[41]

Notwithstanding, Nexus is correct that the plaintiffs failed to provide any basis for disregarding the legal separateness of it and CGAS. Although the plaintiffs recite language quoted above from the complaint alleging that Nexus is liable to them, the cases cited by plaintiffs fall short of supporting their contention that Nexus itself may be held liable as the alter-ego of any combination of the remaining defendants.[42] Because no basis for liability was shown for Nexus, the trial court erred by denying Nexus's motion for summary judgment.

*Case No. A12A1952*

The notice of cross-appeal that gave rise to Case No. A12A1952 was filed jointly by The Medical Center and its officers Faulk and Goolsby. Their joint notice

---

[41] See *Pet Care Professional Center v. BellSouth Advertising & Publishing Corp.*, 219 Ga. App. 117, 118-119 (1) (464 SE2d 249) (1995) (holding that "complete identity" of ownership is not required if a corporation is to be deemed a successor-in-interest to a predecessor entity); *Ney-Copeland & Assocs. v. Tag Poly Bags*, 154 Ga. App. 256 (267 SE2d 862) (1980) (concluding that, by reasons of an identity of name, objects, assets, and stockholders, that a subsequently formed corporation was successor-in-interest of a partnership, such that upon its formation, the corporation assumed and was liable for all the debts and obligations of the prior partnership).

[42] See *Pet Care Professional Center*, supra; *Ney-Copeland & Assocs.*, supra.

28

of cross-appeal and their claims of error enumerated in their joint brief show that these parties challenge orders denying their respective motions for summary judgment, which orders were entered on December 13, 2011.

9. For reasons discussed above,[43] because the notice of appeal that allowed for this cross-appeal was filed prior to December 13, 2011, challenges to those orders are not properly before this court. Consequently, this case is dismissed.

*Judgment affirmed in Case No. A12A1950; Judgment reversed in part and appeal dismissed in part in Case No. A12A1951; Case No. A12A1952 dismissed. Ellington, C. J., and Dillard, J., concur.*

---

[43] See Division 7, supra.