**FIRST DIVISION**
**PHIPPS, C. J.,**
**ELLINGTON, P. J., and DILLARD, J.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules/

**March 30, 2015**

# In the Court of Appeals of Georgia

A12A1951. SEWELL et al. v. CANCEL et al.

A12A1952. FAULK et al. v. CANCEL et al.

PHIPPS, Chief Judge.

After the anesthesiology department of a hospital underwent a restructuring, four anesthesiologists who had been working there under their practice group were not selected for continued employment. Alleging that they had been wrongfully terminated because they had voiced concerns of fraudulent billing practices by fellow anesthesiologists, the four anesthesiologists — Angel Cancel, M.D., Pravin Jain, M.D., Grace Duque-Dizon, M.D., and Monajna Sanjeev, M.D. — filed suit. Included amongst the defendants they named, as have since been grouped by the litigating parties, were: (a) Alvin Sewell, M.D., Sanjiwan Tarabadkar, M.D., and Miles H.

McDonald, M.D.; and (b) Louis Goolsby, M.D., A. Donald Faulk, and The Medical Center of Central Georgia, Inc. ("The Medical Center").

In our decision at *Cancel v. Sewell*,[1] we reviewed several rulings on various defendants' motions for summary judgment.[2] And for reasons explained therein, we affirmed the judgment in Case No. A12A1950; we reversed in part the judgment in Case No. A12A1951, while dismissing that case in part; and we dismissed Case No. A12A1952.[3] The dismissals were based on our determination that this court lacked jurisdiction of an order that had been entered after the filing of the original notice of appeal.[4] In *Sewell v. Cancel*,[5] the Supreme Court of Georgia concluded that jurisdiction had been perfected as to that order, and thus reversed our decision otherwise and remanded Case Nos. A12A1951 and A12A1952 to us for further

---

[1] 321 Ga. App. 523 (740 SE2d 870) (2013).

[2] See id.

[3] See id.

[4] See id. at 536-537 (7), 538 (9).

[5] 295 Ga. 235 (759 SE2d 485) (2014). (The Supreme Court of Georgia denied certiorari in Case No. A12A1950; thereafter, this court issued a remittitur in that case.)

2

proceedings.[6] Accordingly, we vacate Divisions 7 and 9 of our decision at *Cancel v. Sewell*,[7] which divisions pertained to Case Nos. A12A1951 and A12A1952. Because the remainder of our opinion at *Cancel v. Sewell* is not inconsistent with the Supreme Court's decision, it stands unchanged. Therefore, much of the factual and procedural background detailed in that opinion need not be repeated here.

In the order at issue at this juncture, the trial court denied two joint motions for summary judgment. In both motions, the respective defendants had challenged claims that sought to hold them liable on theories of breach of fiduciary duty and fraud. Disposing of those motions, the trial court summarily stated in its order that "there are genuine issues of material facts as to whether the . . . Plaintiffs are entitled to relief for their fraud, breach of fiduciary duty, and aiding and abetting breach of fiduciary duty claims." For reasons explained below, we reverse the judgment in Case No. A12A1951 and vacate the judgment in Case No. A12A1952 and remand that case to the trial court.

---

[6] See id. at 235-236.

[7] Supra at 536-537 (7), 538 (9).

3

Sewell, Tarabadkar, and McDonald challenge the denial of their joint motion for summary judgment on Counts 4 and 5 of the amended complaint, concerning allegations of breach of fiduciary duty and fraud. Countering that challenge, the plaintiffs recite an allegation of their amended complaint:

> Defendants Goolsby, Faulk, and [The Medical Center] engaged in a *conspiracy* along with Defendants Sewell, Tarabadkar and McDonald which resulted in the constructive dissolution of CGAS and the termination of CGAS contractual relations for anesthesiology services with [The Medical Center], and the establishment of a new group of anesthesiologists providing services to [The Medical Center] under the name of The Nexus Medical Group, LLC, which excluded the Plaintiffs.[8]

1. *Conspiracy*. As a preliminary matter, we note that "Georgia law does not recognize an independent tort of 'conspiracy.'"[9] As the Supreme Court of Georgia has espoused,

> A conspiracy is a combination of two or more persons to accomplish an unlawful end or to accomplish a lawful end by unlawful means. Accurately speaking, there is no such thing as a civil action for

---

[8] (Emphasis supplied.)

[9] *McManus v. Taylor*, 326 Ga. App. 477, 484 (3) (756 SE2d 709) (2014).

conspiracy. There is an action for damages caused by acts pursuant to a formed conspiracy, but none for the conspiracy alone.[10]

Therefore, "[i]f no cause of action is otherwise alleged, the addition of allegations concerning conspiracy will not make one; but, where a cause of action is alleged, the fact of conspiracy, if proved, makes any actionable deed by one of the conspirators chargeable to all."[11]

In their appellate briefs, the plaintiffs maintain that they adduced evidence of the torts of breach of fiduciary duty and fraud.

2. *Breach of Fiduciary Duty*. The plaintiffs claim, "There was a breach of fiduciary duty by Sewell, Tarabadkar, and McDonald because they appropriated the assets of CGAS for the benefit of NEXUS, to the exclusion of Plaintiffs."

The gravamen of the plaintiffs' claim is that Sewell, Tarabadkar, and McDonald breached their fiduciary duties and usurped CGAS's corporate opportunities available through CGAS's contract with The Medical Center, whereby only CGAS would provide anesthesiology services to The Medical Center's hospital

---

[10] *U. S. Anchor Mfg. v. Rule Indus.*, 264 Ga. 295, 297 (1) (443 SE2d 833) (1994) (citations, punctuation, and emphasis omitted).

[11] *Cook v. Robinson*, 216 Ga. 328, 329 (4) (116 SE2d 742) (1960) (citations omitted).

in Macon. Each of the four plaintiffs was a director and shareholder of CGAS; each of the four plaintiffs had an employment agreement with CGAS, and thereby practiced medicine at The Medical Center's hospital. However, the contract between CGAS and The Medical Center required that all CGAS physicians voluntarily resign from the medical staff of The Medical Center upon termination of that contract for any reason. Similarly, each employment contract required the CGAS physician to resign from the staff of The Medical Center upon termination of employment with CGAS.

"[A] claim for breach of fiduciary duty requires proof of three elements: (1) the existence of a fiduciary duty; (2) breach of that duty; and (3) damage proximately caused by the breach."[12] Even accepting, arguendo, that the plaintiffs were not required to bring a derivative suit,[13] we agree with Sewell, Tarabadkar, and

---

[12] *Ansley Marine Constr. v. Swanberg*, 290 Ga. App. 388, 391 (1) (660 SE2d 6) (2008) (punctuation and footnote omitted).

[13] See generally *Phoenix Airline Svcs. v. Metro Airlines*, 260 Ga. 584, 585 (1) (397 SE2d 699) (1990) ("The general rule is that actions for breach of fiduciary duties are to be brought in derivative suits. . . . Actions seeking to recover for usurped corporate opportunities belong to the corporation.") (citation and punctuation omitted).

McDonald that the plaintiffs failed to adduce evidence of an essential element of their claim.

Sewell, Tarabadkar, and McDonald argued at the summary judgment hearing that the plaintiffs had failed to show any breach. In particular, these defendants asserted that the termination of CGAS's contract with The Medical Center had *not* been procured by any breach of fiduciary duty, but was the *intended* result of a decision made by the CGAS's directors/shareholders, who had been confronted with an unexpected action taken by The Medical Center. Evidence of that action was set forth in our earlier opinion:

> Faulk (as President/CEO of The Medical Center) sent a letter dated April 25, 2003 to Cancel (as CEO of CGAS), advising that, due to the allegations raised about and by certain CGAS representatives, including behavioral issues and fraudulent billing practices, *The Medical Center was intending to cancel its contract with CGAS, effective May 31, 2003*, pursuant to the contract's "with cause" clause, unless CGAS demonstrated by that date that it was in substantial compliance with the contract. The April 25 letter demanded that CGAS promptly retain a qualified independent consulting firm, subject to The Medical Center's approval of both the firm and its audit protocol, to conduct an audit of

CGAS's billing practices and report the findings thereof to CGAS and to The Medical Center.[14]

Additionally, the April 25 letter announced *The Medical Center's intent to restructure its anesthesiology department effective February 29, 2004*, even if CGAS demonstrated its compliance with their contract on or before May 31, 2003. And the letter informed CGAS that, *beginning May 12, 2003, The Medical Center would begin a "recruitment process for staff anesthesiology positions"* and those hired would become its "employees or independent contractors." The letter outlined that any CGAS physician intending to provide services in the restructured anesthesiology department should promptly submit an application and that, although *The Medical Center could not guarantee that any member of CGAS would be offered a contract of employment within the restructured department, The Medical Center would evaluate each application "fairly, objectively and on its individual merits."*[15]

Counsel for Sewell, Tarabadkar, and McDonald posited at the summary judgment hearing that The Medical Center's action had left the CGAS physicians with essentially "two choices[:] Prove billing compliance and we'll leave you in place until February 29. If you don't prove it, you're out May 31, which is a very short time to go find another job. . . . And, so, it wasn't that they had a lot of choice. I mean my

---

[14] *Cancel v. Sewell*, supra at 526 (emphasis supplied).

[15] Id. (emphasis supplied).

8

people [Sewell, Tarabadkar, and McDonald] didn't have it either." Counsel then cited evidence that, within a few days of receiving Faulk's letter, the CGAS directors/shareholders convened a meeting, ultimately deciding that CGAS would terminate its contract with The Medical Center effective August 31, 2003. Evidence of CGAS's response was detailed in our earlier opinion:

> [A]t a CGAS shareholders and directors meeting on April 29, 2003, the attendees discussed a corporate dissolution. Sewell represented that a dissolution would serve to remove any encumbrances that might stand in the way of the hospital's restructuring and allow the hospital to negotiate contracts with the individuals of the group. At a May 5, 2003 CGAS shareholders and directors meeting, a proposal was unanimously passed that the CGAS contract with The Medical Center would terminate on August 31, 2003.[16]

The minutes from that May 5 meeting reveal that CGAS had its corporate counsel and compliance counsel present, and that CGAS's corporate counsel had proposed at the start of the meeting that CGAS's contract with The Medical Center, as well as all physician employment contracts with CGAS, be terminated effective August 31, 2003, so as to avoid earlier termination for cause.

---

[16] Id.

9

After that meeting, as the evidence showed, many of the CGAS physicians – including the plaintiffs – submitted applications to work in the restructured department.[17] While eight CGAS physicians received offers to join the restructured department, the plaintiffs did not.

Directors and officers of corporations must discharge their duties in good faith and with the care of an ordinarily prudent person in similar positions.[18] "Good faith is not just a question of what is proper for the corporation. It also requires that the stockholders be treated fairly and that their investments be protected."[19]

We agree with Sewell, Tarabadkar, and McDonald that these actions by the CGAS directors/shareholders (including these three defendants) amounted to an exercise of their business judgment, based upon facts available at the time and the

---

[17] See generally *Bacon v. Volvo Svc. Center*, 266 Ga. App. 543, 546 (3) (597 SE2d 440) (2004) ("[A]n employee breaches no fiduciary duty to the employer simply by making plans to enter a competing business while he is still employed. Even before the termination of his agency, he is entitled to make arrangements to compete and upon termination of employment immediately compete.") (citation and punctuation omitted).

[18] OCGA §§ 14-2-830 (a), 14-2-842 (a).

[19] *Comolli v. Comolli*, 241 Ga. 471, 474 (1) (246 SE2d 278) (1978) (considering language in Corporation Code requiring directors to act in "good faith" and with "ordinary diligence" in all transactions).

advice of counsel;[20] and that the plaintiffs failed to cite any evidence that Sewell,

Tarabadkar, and/or McDonald, nevertheless, breached a fiduciary duty in connection

with the termination of CGAS's contract with The Medical Center.[21] The plaintiffs

rely on *Quinn v. Cardiovascular Physicians, P. C.*,[22] wherein the Supreme Court of

Georgia held that a jury should resolve allegations of misappropriation of business

opportunity and breach of fiduciary duty. But *Quinn* is distinguishable. In that case,

Quinn sued a professional corporation and her two former associates for, inter alia,

the misappropriation of business opportunity and violation of fiduciary duties.[23]

Quinn and her two associates – all physicians – had formed their corporation in April

1982 as equal shareholders.[24] About two months afterward, in June 1982, Quinn

---

[20] See generally *Tallant v. Executive Equities*, 232 Ga. 807, 810 (209 SE2d 159) (1974) (noting that courts are reluctant to interfere in matters involving merely the judgment of the majority in exercising control over corporate affairs).

[21] See generally *Southeast Consultants v. McCrary Engineering Corp.*, 246 Ga. 503, 508 (273 SE2d 112) (1980) (explaining that the imposition of liability for wrongful appropriation of a business opportunity requires, inter alia, a showing that "the appropriated opportunity was in fact a business opportunity rightfully belonging to the corporation"), cited in *Brewer v. Insight Tech.*, 301 Ga. App. 694, 695 (1) (689 SE2d 330) (2009).

[22] 254 Ga. 216 (326 SE2d 460) (1985).

[23] Id. at 216-217.

[24] Id. at 216.

11

negotiated a one-year contract with a hospital authority, whereby the corporation would provide cardiology services to the hospital authority.[25] But five months later, Quinn was given notice of a meeting of shareholders and directors, which was called for the purpose of terminating her status as an officer and employee of the corporation.[26] Quinn tendered her resignation as an officer and director, but indicated that she wished to continue working as an employee under the corporation's agreement with the hospital authority.[27] Neither of the other two shareholders responded; nor did they subsequently allocate to Quinn any portion of the corporation's accounts receivable, which had mounted to $138,475 in December 1982.[28] Meanwhile, the two shareholders resolved to terminate all the activities of the corporation;[29] next, they formed a second corporation; then, "through their officers as directors and shareholders of the *first* corporation, transferred all assets of the *first*

---

[25] Id.

[26] Id.

[27] Id.

[28] Id.

[29] Id. at 217.

corporation to the new corporation."[30] Quinn received no notice of any of these matters.[31] On August 1, 1983, the new corporation signed a contract for services with the same hospital authority.[32] Throughout this time, the two shareholders had remained as officers and directors of the first corporation.[33]

When sued by Quinn, the two shareholders contended that there was no business opportunity to be appropriated, positing that the first corporation had become unable to provide cardiovascular services to the hospital authority.[34] This contention was rejected by the Supreme Court, which determined that the record authorized a jury to find that

> this claimed inability was nothing more than the result of the refusal by [the two shareholders] to perform medical services on behalf of the first corporation. . . . A jury might find that, through means of such refusal, [those two shareholders] purposefully destroyed the expectation of

---

[30] Id. (emphasis supplied).

[31] Id.

[32] Id.

[33] Id.

[34] Id. at 219 (4).

renewal which rightfully belonged to the first corporation – all in violation of their duty to it and to Quinn as minority shareholder.[35]

And with respect to the allegation of breach of fiduciary duty, the Court cited evidence that the assets of the first corporation had been "alienated . . . in secret; Quinn was notified of nothing;"[36] the Court explained that a jury might determine that the defendants had "pirated away all the assets of the first corporation," leaving it as "an empty shell, and Quinn's shares in it but a scrap of paper – all in violation of their duties of good faith."[37]

Those circumstances which gave rise to triable issues in *Quinn* were not shown in the instant case. Despite their claim, plaintiffs failed to evince their theory that Sewell, Tarabadkar, and/or McDonald breached a fiduciary duty by "appropriat[ing] the assets of CGAS for the benefit of NEXUS, to the exclusion of Plaintiffs."

---

[35] Id.

[36] Id. at 220 (6).

[37] Id.

Consequently, Sewell, Tarabadkar, and McDonald were entitled to summary judgment on the claim of breach of fiduciary duty.[38]

3. *Fraud*. The plaintiffs claim, "The fraudulent scheme here was to induce the CGAS physicians to vote to terminate the [The Medical Center]/CGAS contract themselves so that the Plaintiffs could be terminated without the procedural protections of the medical staff bylaws and the contractual rights provided by their individual contracts with CGAS."

"The tort of fraud has five elements: a false representation by a defendant, scienter, intention to induce the plaintiff to act or refrain from acting, justifiable reliance by plaintiff, and damage to plaintiff."[39] At the summary judgment hearing, counsel for Sewell, Tarabadkar, and McDonald argued that the plaintiffs had failed to adduce any evidence of a false representation.

Although the plaintiffs maintain that they were duped into voting to terminate CGAS's contract with The Medical Center, they have pointed to no evidence to

---

[38] Accord *Claire v. Rue de Paris*, 239 Ga. 191, 194 (236 SE2d 272) (1977) ("The rule is firmly established that where stockholders in a corporation participate in the performance of an act, or acquiesce in and ratify the same, they are estopped to complain thereof.") (citation and punctuation omitted). Cf. *Quinn*, supra.

[39] *Crawford v. Williams*, 258 Ga. 806 (375 SE2d 223) (1989) (citation omitted).

15

support that claim. Moreover, the record shows that when the plaintiffs signed their respective employment agreements with CGAS, they each also executed a resignation document that was held in escrow by CGAS, in which they expressly relinquished upon termination "all due process rights" under The Medical Center's bylaws. The employment agreements provided that the resignation documents would be tendered to The Medical Center upon termination of the physicians' employment for any reason. As such, plaintiffs were aware of these ramifications when they voted to terminate CGAS's contract with The Medical Center. Because the plaintiffs failed to adduce evidence of any false representation made to them by Sewell, Tarabadkar, and/or McDonald, these defendants were entitled to summary judgment on the claims of fraud.[40] Nothing in *Hayes v. Hallmark Apartments*[41] or *Seminole Peanut Co. v. Goodson*,[42] relied upon by the plaintiffs, provides for an outcome in their favor.

---

[40] See *Lau's Corp. v. Haskins*, 261 Ga. 491 (405 SE2d 474) (1991) (reiterating that where "there is no evidence sufficient to create a genuine issue as to any essential element of [a] plaintiff's claim, that claim tumbles like a house of cards").

[41] 232 Ga. 307 (207 SE2d 197) (1974).

[42] 176 Ga. App. 42 (335 SE2d 157) (1985).

Goolsby, Faulk, and The Medical Center (hereinafter, collectively the "Hospital Defendants") challenge the denial of their joint motion for summary judgment on Counts 4 and 5, which sought to hold them liable on theories of breach of fiduciary duty and fraud, respectively. In their joint motion seeking summary judgment, they argued that the plaintiffs had failed to adduce evidence to support elements of their claims of breach of fiduciary duty and fraud. Additionally, they argued that they were entitled to immunity, pursuant to OCGA § 31-7-132, as to all claims against them. In the order denying their joint motion for summary judgment, as stated above, the trial court summarily determined that "there are genuine issues of material facts as to whether the . . . Plaintiffs are entitled to relief for their fraud, breach of fiduciary duty, and aiding and abetting breach of fiduciary duty claims."

4. In their sole enumerated error on appeal, the Hospital Defendants contend they were entitled to immunity. They assert that the plaintiffs' claims arose out of their (the Hospital Defendants') decision not to renew their (plaintiffs') medical staff privileges. The Hospital Defendants assert that, in making those decisions, they were performing "peer review" activities, and therefore were immune from liability pursuant to OCGA § 31-7-132 (a). It provides:

No professional health care provider nor any individual who serves as a member or employee of a professional health care provider or review organization nor any individual who furnishes counsel or services to a professional health care provider or review organization shall be held, by reason of the performance of *peer review* activities, to have violated any criminal law or to be civilly liable under any law unless he was motivated by malice toward any person affected by such activity.[43]

As the Hospital Defendants acknowledge, the Supreme Court of Georgia clarified in *Hosp. Auth. of Valdosta & Lownes County v. Meeks*:[44]

"'Peer review' means the procedure by which professional health care providers evaluate the quality and efficiency of *services ordered or performed by* other professional health care providers . . . ."[45] A "review organization" "engages in or utilizes peer reviews and gathers and reviews information relating to the care and treatment of patients for" certain specified purposes.[46] . . . [W]e hold that a careful reading of these definitions reveals that they address the evaluation of the quality and efficiency of *actual medical care services* and do not encompass the credentialing process to the extent that every decision to

---

[43] (Emphasis supplied.)

[44] 285 Ga. 521 (678 SE2d 71) (2009).

[45] OCGA § 31-7-131 (1).

[46] OCGA § 31-7-131 (3) (B).

extend or maintain staff privileges is a peer review or medical review function.[47]

The Hospital Defendants maintain that they made the requisite showings under *Hosp. Auth. of Valdosta & Lownes County* as follows. The Hospital cited evidence that in May 2003, The Medical Center created a panel – with members that included Goolsby; the psychological consultant who had been engaged to evaluate the interpersonal dynamics amongst the CGAS physicians; a senior CGAS anesthesiologist (who is not a party to this litigation); and the director of the hospital's surgery center – which interviewed and evaluated the CGAS physicians who applied for positions within the anticipated restructured anesthesiology department. According to the Hospital Defendants, "[t]he action taken by the Hospital Defendants underlying the claims is the panel's decision. That decision was the result of peer review, and, therefore, the Hospital Defendants are immune from civil liability in connection with that peer review activity."

The plaintiffs counter that the Hospital Defendants were not entitled to summary judgment based on immunity under OCGA § 31-7-132 because the panel

---

[47] *Hosp. Auth. of Valdosta & Lownes County*, supra at 523 (citations and punctuation omitted; emphasis supplied).

was not evaluating the quality and efficiency of *actual medical care services* (that had been ordered or performed by them (the plaintiffs)). The plaintiffs cite the affidavit testimony of the CGAS anesthesiologist who was on the evaluation panel:

> I was present for each interview. Each interviewee was asked approximately the same questions, and was given a full chance to answer and comment on the topics. Generally, *the interview focused on the future of the Department of Anesthesiology at [The Medical Center's hospital]*, the need for harmonious participation by all anesthesiologists among each other and with [The Medical Center's] staff, and whether the interviewee could be a team player in that context.[48]

The Hospital Defendants respond by citing other evidence, and by relying on orders entered by the trial court.

(a) *Other evidence*. The Hospital Defendants cite the deposition testimony of the psychologist who was on the panel; she described that the evaluations primarily addressed behavioral issues and in-fighting amongst the CGAS physicians. The Hospital Defendants additionally cite similar deposition testimony by Goolsby regarding the panel's determination that the CGAS group of physicians was not functioning properly – recalling that they had been accusing each other of billing

---

[48] (Emphasis supplied by the plaintiffs in their brief.)

20

fraud, and summarizing that their "inability to work together, the constant infighting, bickering and one-upmanship" had become "intolerable."

We agree with the plaintiffs, however. The evidence cited here does not establish that the panel, even if a "peer review" committee, was evaluating the quality and efficiency of "actual medical care services" as contemplated by *Hosp. Auth. of Valdosta & Lownes County*.[49]

(b) *Orders entered by the trial court*. The Hospital Defendants contend, "The trial court erred in denying summary judgment to [them] because the court found that [The Medical Center's] actions underlying the claims were 'peer review activities,' as defined by the peer review statute, but failed to apply the immunity provided for in the same statute. OCGA § 31-7-132."

The record reveals that the trial court appointed a special master to make recommendations upon discovery matters, including whether The Medical Center was required to produce certain documents to the plaintiffs, or the documents were protected by the peer review privilege as codified in OCGA § 31-7-133. Along with that appointment, the trial court ordered, "Documents claimed to be subject to the

---

[49] Supra. Cf*., DeKalb Med. Center v. Obekpa*, 315 Ga. App. 739, 741 (1) (728 SE2d 265) (2012).

medical peer review privilege, will be provided to the Special Master, *in camera*, for his review for him to make recommendations to the Court regarding the validity of the asserted privilege." Thereafter, the special master made recommendations to the trial court that certain documents were protected, and the trial court entered orders adopting the special master's recommendations.

Thus referring to those orders in seeking summary judgment on the ground of immunity, the Hospital Defendants posited in their brief: "*This Court has already ruled that the evaluation process was a peer review activity.*[50] The Court's ruling was correct, and settles this issue."[51] Further, at the summary judgment hearing, counsel for the Hospital Defendants asserted to the court that there was no question "that the Goolsby process was a peer review process as this [c]ourt, you know, has so held." But the trial court interjected, "You know, that's something I'm not sure about, but go ahead." When counsel then referred the court to "orders that have been signed and

---

[50] [The footnote inserted here within these defendants' joint brief stated in full: "January 25, 2010 Order (adopting Special Master's Recommendation Regarding Plaintiffs' Motion for Reconsideration that materials created, prepared, and/or used in the evaluation process for restructuring the anesthesiology department should not be produced because they are subject to peer review privilege and therefore protected from disclosure)."]

[51] (Emphasis in original.)

22

adopted, you know, by the [trial court] accepting the recommendations of the Special Master," the trial court responded, "I'm not sure about the scope of that order. . . ."

Given the circumstances of this case, including the summary order on appeal,[52] we vacate the denial of summary judgment; we remand the case so that the trial court may clarify whether its orders adopting the special master's *discovery* recommendations further determined that, for purposes of immunity under OCGA § 31-7-132 (a), the panel was a peer review committee that was evaluating the quality and efficiency of actual medical care services.[53]

---

[52] Notably, in addition to the remarks concerning the scope of the orders adopting the special master's recommendations, the trial court repeatedly indicated at the summary judgment hearing that there was evidence from which a jury could find malice.

[53] See *McCall v. Henry Med. Center*, 250 Ga. App. 679, 682 (1) (551 SE2d 739) (2001). Cf. *DeKalb Med. Center*, supra at 739-744 (1) (determining that the hospital was entitled to immunity under OCGA § 31-7-132 (a), where the hospital's investigatory credentials committee reviewed physician's patient charts, focusing on whether the physician was properly documenting the treatment of his patients, and where there was no evidence that the peer review process was motivated by malice). See generally *Wilken Invs., LLC v. Plamondon*, 310 Ga. App. 146, 149 (712 SE2d 576) (2011) (vacating judgment and remanding case for further consideration and clarification of order, where appellate court could not determine, inter alia, the grounds for the ruling).

5. The Hospital Defendants have not argued to this court that the denial of summary judgment should be reversed based upon the other grounds they pursued in the trial court. Consequently, we do not reach the propriety of the trial court's denial of summary judgment in that regard.

*Judgment in A12A1951 reversed. Dillard, J., concurs, and Ellington, P.J., concurs in judgment only.*

*Judgment in A12A1952 vacated, and case remanded. Dillard, J., concurs as to Division 5 and concurs in judgment only as to Division 4. Ellington, P. J., concurs in judgment only.*